IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
CASE NO: 7:26-cv-287

| | |
|---|---|
| MARY DOE and<br>JOHN DOE,<br><br>Plaintiffs,<br><br>v.<br><br>BRYNN MARR HOSPITAL, INC., UNIVERSAL HEALTH SERVICES, INC., UHS OF DELAWARE, INC., ACCESS TELECARE, LLC, STEPHANIE TAYLOR, NP, ANDREW V. OWENS, DO, JASMINE MITCHELL, DNP, DARINA CARCERANO, NP, and JANET OLADIPO, DNP,<br><br>Defendants. | **COMPLAINT**<br><br>**(Jury Trial Demanded)** |

NOW COME Plaintiffs Mary Doe and John Doe, by and through their undersigned counsel, and bring this action against Defendants Brynn Marr Hospital, Inc., Universal Health Services, Inc., UHS of Delaware, Inc., Access TeleCare, LLC, Stephanie Taylor, NP, Andrew V. Owens, DO, Jasmine Mitchell, DNP, Darina Carcerano, NP, and Janet Oladipo, DNP. Plaintiffs, complaining of the Defendants, allege and say as follows:

## INTRODUCTION

On July 4, 2025, law enforcement officers brought Plaintiff Mary Doe ("Mary Doe") to a hospital emergency department because her longstanding illness had taken a frightening turn. Her father, Plaintiff John Doe ("John Doe"), who had called for help, arrived soon after. Mary Doe had designated John Doe as her health care agent, granting him authority to make

her medical decisions. Six days later, individuals acting under color of law of the State of North Carolina ("State") delivered Mary Doe under a custody order to Defendant Brynn Marr Hospital, Inc. ("Brynn Marr" or "Hospital"), a for-profit psychiatric facility in Jacksonville, North Carolina. Mary Doe was involuntarily confined for fifty days. The person directing Mary Doe's care and insisting on her confinement was Defendant Stephanie Taylor ("Defendant Taylor"), a nurse practitioner in Texas who saw her for only a few minutes at a time on a video screen, never set foot in the Hospital, and refused to speak with the healthcare providers who had been treating Mary Doe for years.

Within hours of Defendant Taylor's first video encounter with Mary Doe, and before she had even spoken to John Doe, Defendant Taylor recorded in Mary Doe's chart her "concern for factitious disorder imposed by another." By making that rare diagnosis, Defendant Taylor, astonishingly, accused John Doe of fabricating or inducing Mary Doe's illness. Defendant Taylor repeated the false accusation to protective services agencies in three counties and two states, and she used it in court to ensure that Mary Doe would not be released from involuntary confinement at Brynn Marr, falsely telling a district court judge that this was "a case of Munchausen by proxy." No agency ever substantiated Defendant Taylor's false accusation, and no clinical evidence supported it.

Over John Doe's express refusal as Mary Doe's health care agent, Brynn Marr forcibly injected her with powerful antipsychotic medications under a standing "Forced Medication Protocol" and fed her allergens that exacerbated her symptoms. By late August, Mary Doe had developed involuntary facial movements consistent with a drug-induced movement disorder due to the medication she was forcibly administered.

Civil commitment "constitutes a significant deprivation of liberty that requires due process protection." *Addington v. Texas*, 441 U.S. 418, 425 (1979). Neither the State nor a private hospital exercising the State's custodial power may hold a person who is "dangerous to no one and can live safely in freedom." *O'Connor v. Donaldson*, 422 U.S. 563, 575 (1975). On August 29, 2025, after a contested trial in which Brynn Marr urged the court to order Mary Doe to remain confined in its facility against her will, the court found that there was no basis for Mary Doe to be involuntarily committed and finally ordered Mary Doe discharged. Plaintiffs bring this action to hold Defendants accountable for those fifty days and for the injuries to body, mind, and reputation inflicted along the way.

## JURISDICTION AND VENUE

1. This Court has original jurisdiction over this action under 28 U.S.C. § 1331, because Plaintiff Mary Doe asserts claims arising under the Constitution and laws of the United States, and under 28 U.S.C. § 1343(a)(3) and (4), because those claims seek redress for the deprivation, under color of state law, of rights secured by the Constitution and damages under 42 U.S.C. § 1983.

2. This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over the state law claims of both Plaintiffs. Those claims arise from the same involuntary commitment, the same course of treatment, and the same statements and reports that give rise to Mary Doe's claims under 42 U.S.C. § 1983, and all of the claims in this action form part of the same case or controversy.

3. This Court also has original jurisdiction under 28 U.S.C. § 1332(a), independently and in the alternative, over the claims of Plaintiff Mary Doe. Mary Doe is a citizen of [redacted]

No Defendant is a citizen of [redacted] Brynn Marr Hospital, Inc. is a North Carolina corporation with its principal place of business in North Carolina; Universal Health Services, Inc. and UHS of Delaware, Inc. are Delaware corporations with their principal places of business in Pennsylvania; Defendant Taylor is a citizen of Texas; Defendants Owens, Mitchell, Carcerano, and Oladipo are, upon information and belief, citizens of states other than [redacted] and, upon information and belief, no member of Access TeleCare, LLC, through any tier of its ownership, is a citizen of [redacted] The amount in controversy as to Mary Doe's claims exceeds $75,000, exclusive of interest and costs.

4. Venue is proper in this District under 28 U.S.C. § 1391(b)(2), because a substantial part of the events and omissions giving rise to the claims occurred at Brynn Marr Hospital in Onslow County, North Carolina, which lies within this District. Onslow County is assigned to the Southern Division of this Court under Local Civil Rule 40.1.

## PARTIES

5. Plaintiffs proceed by the pseudonyms Mary Doe and John Doe pursuant to their motion for leave to proceed under pseudonyms, filed contemporaneously with this Complaint. Plaintiffs' identities are known to Defendants and will be provided to them under the interim confidentiality terms proposed in that motion.

6. Plaintiff Mary Doe is a thirty-six-year-old citizen of the State of [redacted] At all times relevant to this Complaint she was domiciled at her family's home in [redacted] where she lived with her mother, and she remains domiciled in [redacted] today.

7. Plaintiff John Doe is Mary Doe's father and a citizen of the State of Texas. At all times relevant to this Complaint, John Doe was Mary Doe's designated health care agent under a

valid health care power of attorney, a designation Defendants acknowledged throughout her hospitalization.

8. Defendant Brynn Marr Hospital, Inc. ("Brynn Marr" or the "Hospital") is a North Carolina corporation with its principal place of business at 192 Village Drive, Jacksonville, Onslow County, North Carolina, where it operates an 82-bed inpatient psychiatric hospital doing business as Brynn Marr Hospital. Brynn Marr is licensed under Chapter 122C of the North Carolina General Statutes and is designated by the North Carolina Department of Health and Human Services ("DHHS") as a 24-hour facility for the custody and treatment of individuals held under the State's involuntary commitment laws.

9. Defendant Universal Health Services, Inc. ("UHS") is a Delaware corporation with its principal place of business in King of Prussia, Pennsylvania. UHS is one of the largest operators of behavioral health facilities in the United States and is the ultimate corporate parent of Brynn Marr. UHS is a named certificate holder, jointly with Brynn Marr, on the certificates of need under which the Hospital's psychiatric beds for individuals held under the State's involuntary commitment laws operate, and it accepted the conditions attached to those certificates.

10. Defendant UHS of Delaware, Inc. ("UHS of Delaware") is a Delaware corporation with its principal place of business in King of Prussia, Pennsylvania. Upon information and belief, UHS of Delaware manages the day-to-day operations of UHS behavioral health facilities, including Brynn Marr, and promulgates the policies, staffing models, and utilization practices under which the Hospital operates.

11. Defendant Access TeleCare, LLC ("Access TeleCare") is, upon information and belief, a limited liability company organized under Texas law with its principal place of business in Dallas, Texas. Access TeleCare supplies physicians and nurse practitioners to hospitals by telemedicine. At all times relevant to the allegations in this Complaint, it contracted with Brynn Marr to provide psychiatric coverage by video, and the consultation notes its practitioners generated in Mary Doe's chart were transmitted under the header "FROM: Access TeleCare." Upon information and belief, Access TeleCare employed or engaged Defendants Taylor, Mitchell, Carcerano, and Oladipo to provide services for patients, including Mary Doe, who were involuntarily committed by the State for inpatient psychiatric treatment at Brynn Marr.

12. Defendant Stephanie Taylor ("Defendant Taylor") is a psychiatric mental health nurse practitioner and a citizen of the State of Texas, where she has been licensed since 2019. Defendant Taylor obtained her North Carolina license in 2025. During Mary Doe's hospitalization, Defendant Taylor served as the practitioner principally responsible for Mary Doe's psychiatric care, a role she performed entirely by video from Texas. Defendant Taylor has never been physically present at Brynn Marr Hospital.

13. Defendant Andrew V. Owens, DO ("Defendant Owens") is a physician and, upon information and belief, a citizen of the State of North Carolina. Defendant Owens was Mary Doe's attending physician of record at Brynn Marr. He signed the commitment examinations submitted to the court and approved the forced medication orders described in paragraphs 84 and 85 below.

14. Defendant Jasmine Mitchell, DNP ("Mitchell") is a psychiatric mental health nurse practitioner and, upon information and belief, a citizen of the state of Mississippi. Defendant Mitchell treated Mary Doe by telemedicine, prescribed medications for her, and served as a covering practitioner during Defendant Taylor's absence.

15. Defendant Darina Carcerano, NP ("Carcerano") is a psychiatric mental health nurse practitioner and, upon information and belief, a citizen of the state of Florida. Defendant Carcerano treated Mary Doe by telemedicine during Defendant Taylor's absence.

16. Defendant Janet Oladipo, DNP ("Defendant Oladipo") is a psychiatric mental health nurse practitioner and, upon information and belief, a citizen of the state of Texas. Defendant Oladipo treated Mary Doe by telemedicine during Defendant Taylor's absence.

17. At all relevant times, Defendant Taylor, Defendant Mitchell, Defendant Carcerano, and Defendant Oladipo acted within the course and scope of their employment or agency for Access TeleCare and as the actual or apparent agents of Brynn Marr, which held them out to patients, families, and the court as the Hospital's providers without meaningfully disclosing their contractor status. Defendant Owens and the Hospital's nursing staff acted within the course and scope of their employment or agency for Brynn Marr. Brynn Marr, in turn, operated under the direction, policies, and control of UHS and UHS of Delaware. Each entity Defendant is liable for the acts and omissions of its agents and employees described in this Complaint under principles of respondeat superior, actual agency, and apparent agency.

## STATEMENT OF FACTS

Mary Doe's Illness and Care Before July 2025

18. Mary Doe is a college-educated artist. Before the events described in this Complaint, she lived with her mother in [redacted] made digital art, and spent time with her family.

19. Mary Doe has been chronically ill for most of her adult life. Since January 21, 2016, her care has been directed by [redacted] ("[redacted] a psychiatrist who is board certified in general and child and adolescent psychiatry and a Life Fellow of the American Psychiatric Association.

20. [redacted] working diagnoses for Mary Doe, set out in letters provided to Brynn Marr in July 2025, include [redacted] ([redacted]), [redacted] ([redacted]), [redacted] ([redacted]), [redacted] ([redacted]), [redacted], [redacted] ([redacted]), [redacted] ([redacted]), [redacted] [redacted], and [redacted]. Mary Doe has also been diagnosed with [redacted] [redacted] a [redacted] condition associated with elevated risk of [redacted] and she has tested positive for [redacted] and [redacted] continuously since 2016.

21. Mary Doe's psychotic symptoms have a documented medical signature. [redacted] observed on multiple occasions over nearly a decade that Mary Doe's [redacted] was followed by psychotic episodes lasting up to thirty days before clearing in a predictable pattern. Laboratory testing in 2016 identified [redacted] to [redacted] and [redacted]. In a letter dated August 2, 2024, [redacted] directed that Mary Doe "not consume or use products that contain [redacted]."

22. Mary Doe's history with antipsychotic medication is equally well documented. As [redacted] recorded, prior trials of antipsychotics produced no clear benefit and significant harm, including [redacted], [redacted], [redacted], and [redacted], a [redacted] that can become permanent. Those reactions led Mary Doe's physicians to discontinue prescribing antipsychotic medications to her.

23. Mary Doe also carries a diagnosis of [redacted] arising from a [redacted]. That history is not disputed. It appears in Brynn Marr's intake records, which document that Mary Doe was "[redacted]" and had "experienced [redacted]," and it was known to the Hospital's staff from the outset of her admission.

24. Mary Doe responded to [redacted] treatment. She was evaluated at [redacted] for suspected [redacted], received [redacted] after direct evaluation and multidisciplinary discussion at that academic medical center, and demonstrated significant clinical improvement, although [redacted] side effects ultimately proved intolerable. Mary Doe's physicians discussed [redacted] and [redacted] as next steps for the treatment of Mary Doe's diagnosed [redacted].

25. Mary Doe's [redacted] presentation is documented not only in her own records but in the published medical literature. In 2023, before any of the events at Brynn Marr, physicians who had treated Mary Doe during an earlier hospitalization published a peer-reviewed case report describing her presentation and course as a patient with [redacted]

whose recurrent psychosis resolved with elimination of [redacted][1] The case report, which describes Mary Doe as a woman with [redacted], [redacted], and [redacted] sets out laboratory results confirming [redacted] against her own [redacted], both [redacted] and [redacted], findings consistent with [redacted]. It documents that her psychosis followed [redacted] in a predictable pattern and resolved when she was maintained on a [redacted] with no more than as-needed low-dose antipsychotic medication. The article was written and published without the knowledge, participation, or consent of Mary Doe or her family, so its clinical observations cannot be dismissed as the product of the family's advocacy.

26. In early 2025, the family brought Mary Doe to the Charlotte, North Carolina area so that [redacted] ("[redacted] a board-certified neurologist, could evaluate her. [redacted] and his team examined Mary Doe in person at her temporary home in Monroe, North Carolina on several occasions, spoke at length with [redacted] and Mary Doe's family, and reviewed years of Mary Doe's records.

27. Through the spring of 2025, Mary Doe lived in her temporary home in Monroe, North Carolina, in a rural area of Union County. She lived under her family's care and did not require hospitalization.

---

[1] [redacted] (2023).

Union County Petition and Six Days in an Emergency Department

28. In late June 2025, Mary Doe's condition deteriorated. She grew agitated, ate and drank less, and produced less urine, a pattern her family recognized from prior [redacted].

29. On June 27, 2025, while Mary Doe was under evaluation at an Atrium Health facility in Union County, North Carolina, a neurologist[2] performed a one-time consultation. The neurologist did not speak with [redacted] or [redacted] or take a medical history of Mary Doe from her parents. His note expressed skepticism of Mary Doe's diagnostic history. As set out below, that single remote consultation became the foundation on which Brynn Marr's providers later discarded a decade of documented medical care.

30. On July 4, 2025, law enforcement officers brought Mary Doe to the Atrium Health Union emergency department in Union County, North Carolina, and John Doe arrived separately a short time later. An emergency physician at the facility, Alexander Eskandari, MD, acting as a commitment examiner, petitioned for Mary Doe's involuntary commitment, describing a [redacted], and recommended inpatient commitment for up to seven days.

31. That evening, a judicial official in Union County issued a custody order in Union County [redacted] ("Union County Case"), commanding any law enforcement

[2] The neurologist is not identified by name in the note of Dawn J. Fyler, MD ("Dr. Fyler"), who conducted a behavioral health examination of Mary Doe at Atrium Health in Union County by telehealth at 8:56 p.m. on July 4, 2025. Dr. Fyler's note from July 4, 2025 is the first time this information appears in Mary Doe's available medical records.

officer to take Mary Doe into custody and transport her "directly to a 24-hour facility designated by the State for the custody and treatment of involuntary clients."

32. No designated facility had an available bed. Mary Doe was held at Atrium Health Union for six days, from July 4 through July 10, 2025, awaiting placement. Mary Doe's baseline laboratory studies drawn there were stable, including a normal platelet count.

33. On July 10, 2025, a law enforcement officer, acting under the authority of the custody order entered in the Union County Case, transported Mary Doe roughly four hours and delivered her into the custody of Brynn Marr Hospital at 1:40 p.m. The Onslow County involuntary commitment proceeding was opened in Onslow County [redacted] ("Onslow County Case").

Brynn Marr, UHS, and the State's Involuntary Commitment System

34. Brynn Marr is a for-profit psychiatric hospital. It is owned, operated, and managed within the UHS corporate family, and upon information and belief, its budgets, staffing models, admission and utilization practices, and clinical policies are set or approved by UHS and UHS of Delaware.

35. Brynn Marr's psychiatric beds for patients involuntarily committed by the State for inpatient psychiatric treatment exist in substantial part because the State chose to delegate its authority to care for and treat these patients to Brynn Marr. In 2012, the North Carolina Department of Health and Human Services ("DHHS") conditionally approved the transfer of twelve beds for patients involuntarily committed by the State for inpatient psychiatric treatment to Brynn Marr from Broughton Hospital ("Broughton"), a State-owned psychiatric hospital located at 1000 S. Sterling St., Morganton, North Carolina 28655. In 2021, DHHS

approved the relocation of up to ten more Broughton beds for patients involuntarily committed by the State for inpatient psychiatric treatment to Brynn Marr under Policy PSY-1 of the State Medical Facilities Plan. Brynn Marr Hospital, Inc. and Universal Health Services, Inc. are the named certificate holders on the 2012 and 2021 approvals described in this paragraph.

36. The certificate of need process through which the beds described in paragraph 35 above came to Brynn Marr is governed by State law. Under Article 9 of Chapter 131E of the North Carolina General Statutes, no hospital may add or relocate psychiatric beds without first obtaining a certificate of need from DHHS, and the beds Brynn Marr holds for the State's involuntarily committed patients were relocated from Broughton Hospital only after DHHS reviewed the applications, made the findings required by N.C. Gen. Stat. § 131E-183, and issued written conditional approvals. Each approval names Brynn Marr Hospital, Inc. and Universal Health Services, Inc. as the certificate holders, and each is expressly conditioned on the certificate holders' agreement, in writing, to comply with every representation made to the State and with the conditions the State attached. The 2012 approval authorized the transfer of twelve beds; the 2021 approval authorized the relocation of up to ten more, bringing Brynn Marr to eighty-two licensed inpatient psychiatric beds. Both approvals issued to Brynn Marr and UHS jointly.

37. Both certificates require the certificate holders to "accept patients requiring involuntary admission for inpatient psychiatric services." Accepting the State's involuntary psychiatric patients is a regulatory obligation that Brynn Marr and UHS assumed in writing in exchange for the State-authorized beds at Brynn Marr. The condition is not a formality. By accepting

the beds relocated from Broughton, Brynn Marr and UHS bound themselves to keep those beds open to the population the State could not house in its own psychiatric hospitals, and the Defendants did so knowing that the State-authorized beds would be filled by patients seized under court order and delivered into the Hospital's custody by law enforcement. The State retained the certificate holders' written promises as the consideration for surrendering beds from a State psychiatric hospital into private, for-profit hands.

38. Policy PSY-1 conditions the transfer of State-authorized hospital beds for patients involuntarily committed by the State for inpatient psychiatric treatment on "a written memorandum of agreement between the local management entity-managed care organization serving the county where the beds are to be located, the secretary of the North Carolina Department of Health and Human Services," and the receiving hospital. Brynn Marr and UHS executed such memoranda of agreement with the Secretary of DHHS to obtain the transfer of the beds for patients involuntarily committed by the State for inpatient psychiatric treatment from Broughton to Brynn Marr.

39. DHHS, acting under the authority of State law, has designated Brynn Marr as a 24-hour facility for the custody and treatment of involuntary clients under Chapter 122C of the North Carolina General Statutes. That designation made Brynn Marr a lawful destination for Mary Doe pursuant to the July 4, 2025 custody order entered in the Union County Case, and it is that designation that grants the Hospital the State's power to hold a citizen against her will and receive payment for providing involuntary psychiatric treatment. No private hospital may lawfully detain a citizen under Chapter 122C of the North Carolina General Statutes without that designation. It is the State's designation, layered on top of the State's custody order, that

transforms Brynn Marr from a private business into the arm of the State that actually holds the person, administers the treatment, and decides when, if ever, she may go home.

40. The State funds Brynn Marr directly. Among other public funding, DHHS disbursed $500,000 to Brynn Marr Hospital under project HHS-176, drawn from the federal State Fiscal Recovery Funds the State received under the American Rescue Plan Act of 2021 and administered through the North Carolina Pandemic Recovery Office. The disbursement went directly to Brynn Marr, a private for-profit hospital, and by the State's own accounting the full $500,000 was drawn down and the project completed. These public dollars flowed to Brynn Marr as one of the facilities the State relies upon to house and treat the short-term inpatient behavioral health population it cannot serve in State-owned hospitals, the same population the Hospital's certificate of need conditions obligate it to accept. Brynn Marr thus does not merely accept the State's involuntary patients; it is paid, with public funds and on the State's behalf, to hold and treat them.

41. When Brynn Marr accepts an involuntary psychiatric patient under a custody order entered under State law, it performs functions that belong to the State. Brynn Marr takes custody of a person seized under court order; conducts the examinations required by N.C. Gen. Stat. § 122C-266 and files them with the clerk of court; initiates rehearings when it wishes to extend a patient's involuntary commitment; has a clinical representative present to address the court to support its request to extend a patient's involuntary commitment; and controls the patient's physical liberty, visitation, communication, and release.

42. The commitment docket at Brynn Marr operates as a weekly institutional routine in Onslow County District Court in Jacksonville, North Carolina. Hearings are conducted by

videoconference. Respondents are represented by one of a few attorneys under contract to handle the Hospital's commitment calendar, and the Hospital's clinical representative speaks to the judge directly without the formality of an evidentiary hearing.

43. Brynn Marr's revenue and profitability depends on beds filled with patients involuntarily committed by the State for inpatient psychiatric treatment. The Hospital bills payors for each day of an inpatient stay, and commercially insured patients generate, upon information and belief, substantially higher reimbursement than the government-pay patients who make up much of its census. At all times relevant to the allegations herein, Mary Doe had CareFirst Blue Cross Blue Shield health insurance coverage. Within the UHS behavioral health system, the practice of keeping beds filled has a name. Federal and state regulators, congressional investigators, and litigants across the country have alleged that UHS operates its behavioral health facilities on a "heads in beds" strategy, admitting patients who do not require inpatient care and holding patients longer than their conditions warrant in order to capture the per-diem revenue that each occupied bed generates. A widely reported 2016 investigation documenting the accounts of employees at a dozen UHS hospitals described pressure to fill beds by exaggerating patients' symptoms and to hold patients until their insurance benefits were exhausted, and a 2024 report of the United States Senate Finance Committee that examined UHS among other operators of behavioral health facilities concluded that keeping beds filled to maximize profit is embedded in the company's operating model.[3] The 2020 federal settlement described below resolved allegations of the same character. The financial

[3] *See* Rosalind Adams, *Intake: Locked on the Psych Ward*, BUZZFEED NEWS (Dec. 7, 2016); Staff of S. Comm. on Fin., 118th Cong., *Warehouses of Neglect: How Taxpayers Are Funding Systemic Abuse in Youth Residential Treatment Facilities* (2024).

logic of that practice bore directly on Brynn Marr's conduct with respect to Mary Doe. As a commercially insured patient occupying a State-authorized bed, Mary Doe was a source of daily reimbursement for so long as the Hospital could justify her confinement, and every step the Hospital took to prolong that confinement advanced its own economic interest.

44. UHS's behavioral health division has a documented corporate history of admission and length-of-stay abuse. In July 2020, UHS, UHS of Delaware, and their behavioral health subsidiaries paid $122 million to resolve federal False Claims Act allegations that their facilities admitted patients who did not need inpatient care, failed to discharge patients when they no longer needed treatment, and billed for excessive lengths of stay.[4]

45. Prior to Mary Doe's admission, Brynn Marr was on notice of its own serious compliance failures. In 2022 and 2023, surveys by the Centers for Medicare and Medicaid Services and DHHS produced statements of deficiencies at Brynn Marr documenting, among other things, the Hospital's failure to complete investigations of patient abuse allegations and failure to determine whether such allegations were substantiated, along with deficiencies in treatment planning and documentation.

<u>Admission Day: Consent Forms Signed by a [redacted] Patient</u>

46. Brynn Marr's records describe Mary Doe's condition on arrival on July 10, 2025 as [redacted].

---

[4] Press Release, U.S. Dep't of Justice, Universal Health Services, Inc. and Related Entities to Pay $122 Million to Settle False Claims Act Allegations Relating to Medically Unnecessary Inpatient Behavioral Health Services and Illegal Kickbacks (July 10, 2020), https://www.justice.gov/opa/pr/universal-health-services-inc-and-related-entities-pay-122-million-settle-false-claims-act.

47. Within hours of Mary Doe's arrival on July 10, 2025, the Hospital generated admission paperwork bearing what purport to be Mary Doe's signatures. A receipt of the notice of privacy practices was purportedly signed by Mary Doe at 2:01 p.m. on July 10, 2025. A consent for treatment services was purportedly signed by Mary Doe at 2:05 p.m. the same day.

48. The Hospital also obtained a purported patient signature of Mary Doe, dated July 10, 2025, on a consent for treatment with antipsychotic medications. That form names "Stephanie Taylor," referring to Defendant Taylor, as the provider, although Defendant Taylor had not yet evaluated Mary Doe and would not do so until the following day. The form warns that antipsychotic medications taken for extended periods can cause "persistent, involuntary movements of the face, mouth, or extremities" that are "potentially irreversible."

49. The Hospital's forms contemplate a situation in which a psychiatric patient may be unable to read and understand the information provided. The consent documents include an attempts-for-consent section listing, as reason number two, "ADULT PATIENT NOT PSYCHOLOGICALLY STABLE," with space to document attempts to reach a legally responsible person. No such attempt was documented by Brynn Marr. Instead, the Hospital treated the purported marks of a [redacted] nonverbal woman, Mary Doe, as informed consent.

50. Brynn Marr knew that Mary Doe lacked the capacity to provide informed consent for her treatment at the time of her arrival on July 10, 2025. Brynn Marr's treatment team determined, in Defendant Taylor's later sworn words, that Mary Doe "lacks decision-making capacity since her admission to the Hospital." Brynn Marr's counsel told the court in the Onslow County Case on August 1, 2025 that "[Mary Doe] currently lacks capacity as has been

determined by clinicians." The July 10, 2025 consents were void from the moment they were signed, and Brynn Marr and Defendant Taylor knew it.

51. On July 11, 2025, the Hospital's precertification coordinator submitted a precertification request for the admission to CareFirst Blue Cross Blue Shield, listing a diagnosis of [redacted] unspecified (F20.9), which had been assigned as the admitting diagnosis before any psychiatric provider at the Hospital had evaluated Mary Doe.

52. John Doe asserted his authority as Mary Doe's health care agent immediately upon Mary Doe's arrival at Brynn Marr. John Doe provided the Hospital with [redacted] July 10, 2025 diagnosis letter, identified himself as Mary Doe's agent, and asked the Hospital to honor Mary Doe's documented [redacted] and her history of harm from antipsychotic medications. The Hospital acknowledged John Doe's status as Mary Doe's health care agent and then disregarded it.

53. When John Doe arrived at Brynn Marr on July 10, 2025, he met with Turquita Henderson ("Ms. Henderson"), the Hospital's Director of Clinical Services, identified himself as Mary Doe's health care agent, and explained that he had come to have Mary Doe's status converted to voluntary so that she could be treated or transferred to a facility closer to her family. Ms. Henderson told John Doe that Mary Doe was being held involuntarily. From that first conversation forward, the Hospital maintained that Mary Doe could be moved only as a voluntary patient and refused to convert her to voluntary status, even when John Doe identified facilities prepared to accept Mary Doe that were better equipped to treat her but declined her transfer for the sole reason that Mary Doe was involuntarily committed.

July 11 and 12: Defendant Taylor Accuses John Doe Before Speaking to Him

54. Defendant Taylor conducted her initial psychiatric evaluation of Mary Doe on July 11, 2025, remotely by video. Defendant Taylor's notes reflect that Mary Doe was [redacted] and could not participate in the evaluation.

55. At 1:07 a.m. on July 12, 2025, Defendant Taylor electronically signed her initial consultation, conducted remotely by video, note for Mary Doe. In Defendant Taylor's note, she recorded impressions of [redacted] and [redacted] wrote that Mary Doe was "[redacted]" and that she would be "generating a report to Adult Protective Services due to concern for [redacted] concern for factitious disorder imposed by another." The same note records Defendant Taylor's plan for contact with Mary Doe's family: "Will call and speak to family on Monday."

56. Defendant Taylor's statements establish that she recorded her accusation against John Doe before she had any basis to make it. She had not spoken with John Doe, as her note recites that she would "call and speak to family on Monday." She had not obtained or reviewed [redacted] records, had not spoken with [redacted] or [redacted] and had not performed an evaluation of any kind of John Doe. She nonetheless committed to paper both a plan to report John Doe to APS and a "concern for factitious disorder imposed by another" that pointed at him as the supposed perpetrator. The sequence, accusation first, investigation never, is the hallmark of a statement made with reckless disregard for whether it was true.

57. Factitious disorder imposed on another, once called Munchausen syndrome by proxy, is a psychiatric diagnosis of the perpetrator more than the patient. Under the DSM-5, this disorder applies to a person who falsifies or induces illness in someone under his care, and

diagnosing it requires an evaluation of both the patient and the suspected perpetrator. When Defendant Taylor recorded her "concern" at 1:07 a.m. on July 12, 2025, she had not met with John Doe, spoken with him, interviewed a single collateral source about him, or reviewed [redacted] extensive treatment records for Mary Doe. The diagnosis requires proof that the caregiver, in this case John Doe, knowingly falsified or induced illness for the purpose of assuming the sick role by proxy, and by professional convention it is made over time, with the input of an interdisciplinary team, and only after a formal evaluation of the accused caregiver. Defendant Taylor did not adhere to the diagnostic protocol. Defendant Taylor never evaluated John Doe, identified no evidence that he had fabricated or induced anything related to Mary Doe's diagnosis, and entered the diagnosis after only brief video encounters with Mary Doe alone, on the strength of nothing more than a family's insistence on pursuing the medical workup that Mary Doe's personal physicians had ordered.

58. The [redacted] and [redacted] diagnoses Brynn Marr assigned to Mary Doe were entered with the same reckless disregard for diagnostic method and standard of care. [redacted] under the DSM-5 cannot be diagnosed unless the disturbance has persisted for at least six months and unless psychosis attributable to another medical condition has been excluded. Mary Doe's records documented a decade of diagnosed medical conditions capable of causing psychosis, which by definition should have excluded a primary [redacted] diagnosis, and Brynn Marr assigned the label within a day of her arrival, before any provider there had examined her in person, obtained her treating physicians' records, or performed any workup for the [redacted] contributors already in her chart. [redacted] which Brynn Marr also diagnosed, is a recognized manifestation of [redacted] of the central nervous

system, and its presence in a patient with documented [redacted] should have prompted a medical evaluation rather than a course of antipsychotic medication known to worsen [redacted] and to carry an elevated risk of neuroleptic malignant syndrome. The Hospital did not order a medical evaluation or draw laboratory studies for the eight weeks of Mary Doe's admission, and it never reconciled its diagnoses with the exclusionary criteria that Mary Doe's history plainly implicated.

59. In the same July 12, 2025 note, Defendant Taylor inexplicably discarded Mary Doe's medically ordered [redacted]. Defendant Taylor dismissively wrote that Mary Doe's reactions to [redacted], as reported by Mary Doe's family, were not [redacted] in nature, observed that "this group of [redacted]," and "ordered [redacted]." Beginning on July 12, 2025 and continuing throughout Mary Doe's involuntary confinement at Brynn Marr, the Hospital served Mary Doe [redacted] and [redacted].

60. Also on July 12, 2025, John Doe drove four hours to visit Mary Doe and was turned away because the Hospital did not permit Saturday visitation. [redacted] called the Hospital twice during the weekend of July 12-13, 2025, asking to speak to Defendant Taylor. The Hospital's notes for July 12, 2025 reflect that [redacted] urged the nursing staff not to administer antipsychotic or psychotropic medications to Mary Doe. Defendant Taylor did not return [redacted] calls.

61. On July 13, 2025, on a telephone order from Defendant Mitchell, Brynn Marr staff administered STAT haloperidol and an intramuscular injection of diphenhydramine to Mary Doe for "aggression."

62. On the morning of July 14, 2025, Defendant Taylor signed the note that first recorded factitious disorder on Mary Doe's chart as a coded diagnosis: "F68.A: Factitious disorder imposed on another." Mary Doe, the supposed victim, now carries on her permanent medical record, and in every bill built from it, a stigmatizing and inaccurate diagnosis falsely describing John Doe as an abuser.

63. Defendant Taylor's same July 14, 2025 note forecast her false reporting campaign: "Will be making APS reports to Onslow County - where patient is currently hospitalized, Mecklenburg County - patient has been living with father in Charlotte NC for the past 6 months, and [redacted] County, [redacted] - where patient usually resides with mother."

64. Only after documenting her plan to falsely report John Doe as an abuser of Mary Doe, without any medical or factual basis, did Defendant Taylor speak with John Doe for the first time on or about July 14, 2025. Defendant Taylor's note of the call records that John Doe pleaded for his daughter's documented [redacted] and warned that benzodiazepines would harm her; that Defendant Taylor "discussed additional impression of factitious disorder by proxy"; and that "as a mandated reporter I will be making an APS report for medical neglect."

65. Later in the day on July 14, 2025, Defendant Taylor convened a call with Defendant Owens and two medical providers and recorded their conclusion that there was "no current medical indication for [redacted]." None of the participants on the call with

Defendant Taylor and Defendant Owens had examined Mary Doe in person, taken a history from her treating physicians, or reviewed [redacted] records.

Defendant Owens's Examinations: Telehealth, Boilerplate, and a One-Word Impression

66. North Carolina law conditions continued involuntary commitment on examinations by qualified examiners, including an examination by a physician. *See* N.C. Gen. Stat. § 122C-266. At Brynn Marr, those examinations were conducted by Defendant Owens, and the forms he signed for Mary Doe follow a pattern.

67. Defendant Owens examined Mary Doe on July 11, 2025, by telehealth. The examination form he used contains a mandatory certification for telehealth examinations, by which the physician must certify "to a reasonable degree of medical certainty that the results of the examination via means of telehealth were the same as if I had been personally present with the respondent." On the July 11, 2025 form Defendant Owens completed for his examination of Mary Doe, that certification is unchecked. The narrative findings consist of four sentences. The entire impression reads: "psychosis." Based on this superficial evaluation, the form completed by Defendant Owens on July 11, 2025 recommends fifteen days of inpatient involuntary commitment for Mary Doe.

68. The form for Defendant Owens's July 29, 2025 examination of Mary Doe, also conducted by telehealth, repeats the July 11, 2025 form's narrative nearly verbatim and again offers the one-word impression "psychosis." The form for Defendant Owens's August 12, 2025 examination of Mary Doe does the same, adding that Mary Doe was "requiring forced medication protocol again due to noncompliance." The July 11, 2025, July 29, 2025, and August 12, 2025 forms completed by Defendant Owens for his cursory examinations of Mary

Doe were each filed with the clerk to justify further confinement and forcible medication of Mary Doe.

The Adult Protective Services Campaign

69. Defendant Taylor followed through on the reporting plan she had forecast in her July 14, 2025 note. Beginning on or about July 16, 2025, Defendant Taylor attempted to make false Adult Protective Services ("APS") reports accusing John Doe of abusing and neglecting Mary Doe to Onslow County, Mecklenburg County, and [redacted] County, [redacted] Defendant Taylor's notes reflect that the APS agency in [redacted] referred the matter back to North Carolina; that she "Called Onslow and Mecklenburg x 2 apiece" after "both stated the report should go to the other county"; and that she obtained the name of a Mecklenburg County supervisor from the Hospital's Director of Clinical Services so that she could "attempt to reach her for escalation."

70. Defendant Taylor confirmed the APS false reporting campaign's scope under oath, testifying on August 29, 2025 that she had reported John Doe to "at least four or five different adult protective services agencies."

71. The content of the false APS reports is consistent with the false accusations Defendant Taylor recorded in Mary Doe's chart at Brynn Marr and thereafter repeated to the court in her testimony in the Onslow County Case. Defendant Taylor testified on August 29, 2025, without any personal knowledge or basis, that John Doe had [redacted] Mary Doe by [redacted], that [redacted]

[5] The residence in which Mary Doe and her family lived had a deadbolt, as many homes do, and the family used it for ordinary security in a rural area.

[redacted], and that John Doe was medically neglecting Mary Doe by pursuing treatment for her documented [redacted] rather than accepting a baseless [redacted] diagnosis.

72. Union County's APS opened an investigation of John Doe based on Defendant Taylor's false report. By August 1, 2025, Union County had advised Defendant Taylor and Brynn Marr that it would be closing the investigation because, as recounted on the record at the August 1, 2025 hearing in the Onslow County Case, Mary Doe was "safe while she's at (sic) Bryn Mawr." At the Hospital's request, the August 1, 2025 commitment order in the Onslow County Case was annotated by hand: "Counsel for [Mary Doe] and Union County APS shall be immediately notified of the patient's discharge." The Hospital maliciously arranged for the baseless abuse investigation of John Doe to reopen if Mary Doe were to be released from Brynn Marr.

73. No APS agency in any county or state ever substantiated Defendant Taylor's false allegations against John Doe.

74. Defendant Taylor's malicious campaign against those who cared for Mary Doe and contradicted Defendant Taylor's predetermined and inaccurate diagnoses of Mary Doe did not stop with falsely reporting John Doe to APS agencies. In July 2025, Defendant Taylor also filed in bad faith a complaint against [redacted] with the [redacted] Board of Physicians attacking the diagnoses [redacted] had made over a decade of treatment of Mary Doe.

75. Defendant Taylor made and repeated these false accusations against John Doe knowing she could not support them. Defendant Taylor conceded under oath in her testimony in the Onslow County Case on August 29, 2025 that she never met John Doe and that she could not

satisfy the diagnostic criteria for factitious disorder imposed on another without a formal evaluation of him, yet she had already entered that diagnosis on Mary Doe's chart under code F68.A and carried it into the Hospital's billing records. Defendant Taylor reported John Doe not once but to four or five separate APS agencies, escalating from county to county and across state lines when the agencies she first contacted declined to act, and she solicited the name of a county supervisor so that she could press the matter further. A provider acting in good faith, confronted with a decade of consistent records from a treating psychiatrist and the absence of any substantiation, would have reconsidered the reckless course of action Defendant Taylor had planned, but Defendant Taylor instead intensified her reporting and used the accusation to keep John Doe away from Mary Doe and to keep Mary Doe confined. Defendant Taylor's conduct was not a good-faith report by a mandated reporter but instead a deliberate, malicious campaign undertaken for the Hospital's financial benefit, and it forfeits any qualified privilege and any statutory good-faith immunity, including under N.C. Gen. Stat. § 108A-102(c).

76. Meanwhile the F68.A code and the abuse narrative propagated through Mary Doe's chart at Brynn Marr and beyond it. The Hospital's psychosocial assessment of Mary Doe on July 16, 2025 repeats the report of "concern for medical neglect as well as concern for factitious disorder imposed by another." Defendant Mitchell carried the false F68.A diagnosis forward in notes signed July 19, 2025, July 21, 2025, and July 23, 2025. Defendant Carcerano repeated the false F68.A diagnosis on July 25, 2025. Defendant Oladipo repeated the false F68.A diagnosis in her notes in July 2025 and August 2025. Upon information and belief, the Hospital transmitted the diagnosis and its supporting clinical narrative to CareFirst on

numerous occasions between July 15, 2025 and August 29, 2025 in connection with precertification and concurrent utilization review. Each entry, report, and transmission was a new and independent publication of the false accusation that John Doe was abusing Mary Doe.

<u>July 18: An Unsworn Presentation and a Commitment Order</u>

77. Mary Doe's initial commitment hearing in the Onslow County Case was held by videoconference on July 18, 2025. Brynn Marr did not facilitate Mary Doe's participation in the hearing on July 18, 2025. The Hospital reported that Mary Doe was "not in a state of mind to be interviewed today," and her appointed counsel waived her appearance.

78. Defendant Taylor appeared in the Onslow County Case on July 18, 2025 for the Hospital, but she was not sworn as a witness before making statements upon which the court relied. Asked to address whether John Doe might participate in the hearing on July 18, 2025, Defendant Taylor responded, without any personal knowledge or factual basis, to the court in the Onslow County Case:

> So to make it short, this is a case of Munchausen by proxy, where the father [referring to John Doe] and a set of pediatricians have [redacted]

79. Defendant Taylor further falsely told the court in the Onslow County Case hearing on July 18, 2025 that [redacted]

[redacted]

80. No medical record supports the false statements of Defendant Taylor described in paragraphs 78 and 79 above. The Atrium Health Union chart for Mary Doe documents the contacts between John Doe and Mary Doe during her six days in the emergency department at that facility. No note from Atrium Health, Brynn Marr, or any medical provider records Mary Doe [redacted]. The event Defendant Taylor described to the court during the hearing in the Onslow County Case on July 18, 2025 never happened, and Defendant Taylor knew at the time she made the false statements to the court that she had fabricated this event to villainize John Doe and isolate Mary Doe from the person with whom she had entrusted her medical decision making.

81. Defendant Taylor also falsely told the court in the Onslow County Case on July 18, 2025 that [redacted] At the time Defendant Taylor made those false statements to the court in the Onslow County Case, she had not reviewed [redacted] records or spoken with [redacted] or [redacted] and she was resting her medical certainty principally on the June 27, 2025 consultation of an unidentified neurologist who had only seen Mary Doe on one occasion.

82. Asked for the Hospital's recommendation during the July 18, 2025 hearing in the Onslow County Case, Defendant Taylor answered that "on paper we recommended up to 15 days" but that "realistically, due to the level of neglect, [Mary Doe is] likely going to need

probably around a month-long stay." When the court asked again, Defendant Taylor inquired, "Are we allowed to ask for more than that?" Told that fifteen days was the statutory maximum, Defendant Taylor responded: "Statutory limit of 15 days, then, yes, sir."

83. The court adopted the Hospital's recommendation. The written order, entered July 18, 2025, found by clear, cogent, and convincing evidence based on Defendant Taylor's false, unsworn statements, among other facts, "[redacted]; incorporated Defendant Owens's July 11, 2025 report[6] by reference; and committed Mary Doe for up to fifteen more days. The finding at the center of the July 18, 2025 order in the Onslow County Case came solely from Defendant Taylor's unsworn, false, and malicious presentation.

<u>Forced Medication Protocol</u>

84. On July 15, 2025, two physicians, neither of whom examined Mary Doe in person, endorsed the Hospital's internal "forced medication" application for Mary Doe. No court reviewed or authorized the forced medication application. John Doe, Mary Doe's health care agent, was not asked about whether he consented to Mary Doe being forcibly medicated, and when he learned that Mary Doe was being forcibly medicated, he opposed it on her behalf. The only consents in Mary Doe's chart at Brynn Marr were the July 10, 2025 forms signed by Mary Doe in a state the Hospital had described as "[redacted]

85. Defendant Owens entered the orders for the medical to be forcibly administered to Mary Doe on July 15, 2025: lorazepam (Ativan) 0.5 mg by mouth three times daily, with an intramuscular substitution if refused; quetiapine (Seroquel) 50 mg twice daily; and

---

[6] Defendant Owens did not testify at the July 18, 2025 hearing in the Onslow County Case.

chlorpromazine (Thorazine) 25 mg by intramuscular injection, twice daily as needed. Each quetiapine order carried the same standing instruction: "Forced Medication Protocol: If patient refuses PO seroquel, then to be given IM Thorazine."

86. On July 21, 2025, [redacted] sent the Hospital a detailed letter documenting Mary Doe's diagnoses, her prior [redacted] and [redacted] on antipsychotics, and the [redacted] psychosis pattern. [redacted] further cautioned in the July 21, 2025 letter that Mary Doe "should not be prescribed benzodiazepines for anything but very short-term emergent situations." Disregarding [redacted] letter, the Hospital continued administering lorazepam daily, by force when Mary Doe refused, for the remainder of her stay at Brynn Marr through August 29, 2025.

87. Chlorpromazine is a first-generation antipsychotic whose FDA labeling warns of tardive dyskinesia and neuroleptic malignant syndrome, risks of particular concern in a [redacted] patient. [redacted] [redacted] MD, PhD ("Dr. [redacted] a psychiatrist and pharmacologist consulted by Mary Doe's family, explained in a July 14, 2025 letter to Brynn Marr that patients with [redacted] face elevated risk of dystonia, akathisia, paradoxical agitation, worsened [redacted] and neuroleptic malignant syndrome from antipsychotic medication. Dr. [redacted] furnished Brynn Marr with peer-reviewed literature documenting that patients with [redacted] are frequently misdiagnosed with primary psychiatric disorders and are exposed to serious and sometimes irreversible harm when treated with antipsychotic medication, and he warned that administering such medication to Mary Doe risked such harm.

88. The medication regimen prescribed by Brynn Marr for Mary Doe escalated steadily: Quetiapine went from 50 mg twice daily on July 15, 2025 to 100 mg on July 17, 2025 (Defendant Taylor), 150 mg on July 20, 2025 (Defendant Mitchell), 200 mg on July 22, 2025 (Defendant Mitchell), 300 mg on July 27, 2025 (Defendant Mitchell), and ultimately 400 mg twice daily, 800 mg per day, the maximum labeled dose, where it remained through her court-ordered release on August 29, 2025. To the quetiapine prescribed to Mary Doe, the providers at Brynn Marr added oxcarbazepine (Trileptal) 300 mg twice daily for "agitation, adjunct for [redacted] olanzapine (Zyprexa Zydis) 10 mg as needed every six hours, intramuscular chlorpromazine in doses up to 100 mg, and daily lorazepam.

89. Brynn Marr nurses carried out the forced medication protocol described in paragraphs 84 through 88 above, injecting Mary Doe with chlorpromazine, lorazepam, haloperidol, and diphenhydramine on multiple occasions when she refused oral medication. A second forced medication application was approved by two physicians, Dr. Gavito and Dr. Busto, neither of whom had examined Mary Doe in person, on August 18, 2025, and a third forced medication application was under evaluation at the time Mary Doe was released from Brynn Marr on August 29, 2025.

90. Throughout the eight-week admission at Brynn Marr, no laboratory studies were drawn for Mary Doe. Defendant Taylor conceded at the hearing in the Onslow County Case on August 29, 2025 that weekly laboratory monitoring is the standard for a patient on this regimen, that Mary Doe's history includes low platelet counts, and that the only laboratory results Brynn Marr possessed were the July 4, 2025 baselines from Atrium Health in Union

County. The Hospital administered maximum-dose antipsychotic polypharmacy to Mary Doe for eight weeks without the ability to detect organ injury.

91. For a [redacted], the manner of Mary Doe's confinement and treatment was uniquely injurious. Mary Doe's medication orders were written so that a refusal of oral medication would be met with a forcible intramuscular injection, and on multiple occasions Brynn Marr's staff physically restrained her and injected Mary Doe against her will. [redacted]. Every provider who reviewed Mary Doe's chart had access to her documented history of [redacted], yet Brynn Marr's records contain no evaluation of that [redacted], no consideration of it in her treatment, and no recognition that involuntary confinement and forcible medication would predictably intensify her hyperarousal, agitation, and fear. A [redacted] would be expected to experience forcible medication and involuntary confinement as [redacted], and to respond with the agitation the Hospital cited as further justification for involuntarily confining and medicating her.

<u>Mary Doe's Diet, the Superior Court Action, and the Restraining Order</u>

92. For sixteen days after Defendant Taylor removed Mary Doe's dietary restrictions, Brynn Marr served Mary Doe [redacted] and dairy at every meal, in "double portions," while John Doe, [redacted] and [redacted] pressed the Hospital in writing and by telephone to honor her documented restrictions because allowing her to consume allergens would exacerbate her symptoms.

93. In late July 2025, acting as Mary Doe's health care agent, John Doe filed suit against Brynn Marr and UHS in [redacted] and obtained a temporary restraining order enforcing Mary Doe's [redacted]. On July 28, 2025, pursuant to the temporary restraining order entered against Brynn Marr and UHS, the Hospital entered a medical order restricting Mary Doe's [redacted] and [redacted], but the Hospital continued to disclaim the validity of his concerns and the diagnoses made by Mary Doe's long-term medical providers.

94. John Doe requested on numerous occasions that Brynn Marr convert Mary Doe's status to voluntary so that she could be treated or transferred with her family's consent. Defendant Taylor adamantly opposed John Doe's request, maliciously insisting without any medical or legal basis that converting Mary Doe to voluntary status "would almost certainly lead to the Hospital needing to re-petition [Mary Doe] for involuntary commitment" and that the Hospital had "decided to continue to provide [Mary Doe] treatment under the involuntary commitment order." Involuntary status kept the State-authorized psychiatric bed filled, John Doe sidelined as Mary Doe's health care agent, and every alternative placement for Mary Doe foreclosed.

<u>August 1, 2025: Fifteen More Days</u>

95. Mary Doe's commitment was reheard in the Onslow County Case on August 1, 2025. Defendant Taylor was on leave from July 21, 2025 through August 2, 2025, and the Hospital's representation at the Onslow County Case hearing for Mary Doe fell to a covering nurse practitioner, identified in the transcript of the August 1, 2025 hearing as "Ms. Jewel," who told the court she was "just covering for the normal provider" and recommended additional confinement for Mary Doe.

96. John Doe, through counsel, asked to participate in the August 1, 2025 hearing in the Onslow County Case as Mary Doe's health care agent, but the Hospital maliciously opposed John Doe's participation. Brynn Marr's lawyer told the court during the August 1, 2025 hearing that John Doe was not a party and that "[Mary Doe] currently lacks capacity as has been determined by clinicians." The court in the Onslow County Case declined to hear from John Doe or his counsel during the August 1, 2025 hearing.

97. The August 1, 2025 order entered in the Onslow County Case incorporated Defendant Owens's July 29, 2025 report by reference and committed Mary Doe to Brynn Marr for up to fifteen additional days. It carried the handwritten directive, described above, that Union County APS be "immediately notified" of her discharge.

<u>Rehearing, Continuances, and Trial</u>

98. Facing expiration of the August 1, 2025 order, the Hospital sought more time for Mary Doe's involuntary commitment. Defendant Owens performed another cursory telehealth examination of Mary Doe on August 12, 2025, reporting that Mary Doe was "requiring forced medication protocol again due to noncompliance," with the same one-word impression "psychosis," and the Hospital requested a rehearing.

99. The rehearing in the Onslow County Case convened on August 15, 2025, and it was continued at the request of Mary Doe's counsel, who had been retained by John Doe as her health care agent, so that her privately retained counsel could substitute for her court-appointed counsel. The hearing in the Onslow County Case was continued again on August 22, 2025. The Hospital's confinement, forced medication, and billing of Mary Doe continued through and beyond both continuances.

100. On August 28, 2025, at the family's request, Qionna Tinney, MD ("Dr. Tinney"), a North Carolina-licensed psychiatrist, evaluated Mary Doe by telehealth with two Brynn Marr staff members present. Dr. Tinney assessed Mary Doe to be a woman oriented in all spheres, denying suicidal and homicidal ideation, denying hallucinations, and asking to go home. Dr. Tinney alarmingly observed "occasional involuntary facial/mouth movements" of which Mary Doe herself was unaware, consistent with a medication-induced movement disorder.

101. Dr. Tinney's written opinion was unequivocal following her evaluation of Mary Doe on August 28, 2025. Dr. Tinney's report reflected that Mary Doe "appears to be over medicated" with extrapyramidal symptoms; the regimen prescribed for Mary Doe included treatments with no evidence basis for her conditions; the factitious disorder entry was "a hasty label" made "from such brief encounters" that "carries significant stigma and may unnecessarily bias future providers"; and inpatient commitment criteria "are not currently met and have not been met for some time" as to Mary Doe. After receiving Dr. Tinney's written report, Brynn Marr continued to oppose releasing Mary Doe or converting her admission to voluntary status.

102. On August 29, 2025, a contested trial regarding Mary Doe's involuntary commitment was held before The Honorable William Shanahan ("Judge Shanahan") in the Onslow County Case. The Hospital called only Defendant Taylor and Nurse Dudenhoeffer as witnesses to support its request to continue to confine and forcibly medicate Mary Doe. Mary Doe called Dr. Tinney as an expert witness to support her request to be discharged from involuntary commitment at Brynn Marr.

103. During her testimony at the trial in the Onslow County Case on August 29, 2025, Defendant Taylor confirmed that she had never been to Brynn Marr and had never "stepped foot in the building"; that every interaction with Mary Doe had been by video; that the video component of her encounters ran "somewhere between 5 to 15 minutes"; and that notwithstanding the limited remote interaction she had with Mary Doe, the Hospital billed Defendant Taylor's services to Mary Doe's insurance provider under CPT code 99233, a code for fifty-minute, high-complexity daily evaluations. Defendant Taylor confirmed that she had made APS reports regarding John Doe to four or five agencies between July 16, 2025 and August 29, 2025 and that she had also made [redacted] Board complaint against [redacted] Defendant Taylor confirmed that, although she had recorded factitious disorder imposed by another as a diagnosis on Mary Doe's chart and billing records and made multiple reports about John Doe to APS agencies, she had not met John Doe and could not meet the criteria for that diagnosis without evaluating him.

104. Based only on Defendant Taylor's shockingly uninformed and incompetent testimony on August 29, 2025, the Hospital asked the court in the Onslow County Case to extend Mary Doe's involuntary commitment for ninety additional days. The Court immediately denied Brynn Marr's request at the conclusion of the August 29, 2025 hearing, expressly finding that the criteria for commitment had not been met and ordering that Mary Doe be discharged. After fifty days at Brynn Marr and fifty-six days in custody, Mary Doe was released.

Plaintiffs' Injuries

105. Due to the collective wrongful conduct of Defendants, Mary Doe lost fifty-six days of her liberty, fifty of them in a locked psychiatric facility hundreds of miles from her home.

106. Mary Doe was injected against her will by healthcare providers at Brynn Marr, repeatedly, with first-generation antipsychotics, a benzodiazepine her physician had warned against in writing, and sedatives. Mary Doe was also medicated by healthcare providers at Brynn Marr to the maximum labeled dose of quetiapine without laboratory monitoring. Due to the overmedication of Mary Doe during her involuntary commitment at Brynn Marr, at the time she was discharged on August 29, 2025, Mary Doe suffered from involuntary facial and mouth movements consistent with tardive dyskinesia, a condition that is frequently permanent and that her own history and the warnings of her family members made foreseeable to every provider at Brynn Marr who treated her or reviewed her chart.

107. While involuntarily confined at Brynn Marr, Mary Doe was [redacted], including [redacted] and [redacted] had ordered Mary Doe not to [redacted] to Mary Doe's [redacted] and resulting psychotic symptoms.

108. Mary Doe's permanent medical record, and the files of her insurer, now carry false diagnoses of [redacted] and factitious disorder imposed by another (John Doe), labels that will follow her into every future medical encounter, stigmatize her, and bias future providers against John Doe as her health care agent.

109. Defendants labeled John Doe an abuser of Mary Doe in her medical records, to Hospital staff, to APS agencies in at least three counties and two states, and, upon information and belief, to Mary Doe's insurer. Defendants' baseless accusations charged John Doe with conduct that would constitute crimes, including [redacted]. John Doe endured weeks of investigation, was barred from Mary Doe's hearings in the Onslow County Case, was refused visits with Mary Doe at Brynn Marr, and lived under the orchestrated threat of Defendant Taylor that an abuse investigation would be waiting for him the day Mary Doe was discharged from Brynn Marr.

110. Both Plaintiffs suffered, and continue to suffer, severe emotional distress, humiliation, anxiety, and loss of sleep due to the actions of Defendants described herein above. Both Plaintiffs incurred out-of-pocket expenses, including travel and the costs of responding to the investigations Defendant Taylor set in motion. Mary Doe incurred, and remains exposed to, charges billed to her to be paid out of pocket and her insurer by Brynn Marr for the involuntary confinement and treatment that injured her. When Mary Doe did not pay the uninsured expenses Brynn Marr charged for her involuntary commitment, Brynn Marr referred her account to a collection agency.

111. The conduct described above was willful and wanton, malicious, and undertaken with reckless disregard of Plaintiffs' rights. Officers and managers of the entity Defendants participated in and condoned it, as shown by the following:

a. The Hospital's Director of Clinical Services fielded and facilitated the APS escalation instigated by Defendant Taylor and swore a declaration defending Mary Doe's confinement;

b. Hospital leadership met with Defendant Taylor on July 15, 2025 concerning Mary Doe's [redacted];

c. Defendant Owens, Mary Doe's attending physician of record during the time she was involuntarily confined to Brynn Marr, signed each examination and forced medication authorization; and

d. Upon information and belief, the utilization and billing practices applied to Mary Doe during her involuntary confinement at Brynn Marr from July 10, 2025 through August 29, 2025 implemented policies set by UHS and UHS of Delaware. Those practices reflected the same "heads in beds" emphasis on census and length of stay that federal authorities and other litigants have attributed to UHS's behavioral health operations, and they gave UHS and UHS of Delaware a direct financial motive to oppose Mary Doe's release and her conversion to voluntary status.

## FIRST CAUSE OF ACTION
## (Violation of the Fourth and Fourteenth Amendments, 42 U.S.C. § 1983—Mary Doe Against All Defendants)

112. The allegations of all preceding paragraphs are realleged and incorporated by reference as if fully set forth herein.

113. The Fourth Amendment to the United States Constitution, made applicable to the States through the Fourteenth Amendment, protects the right to be free from unreasonable

seizure of the person, including seizure by civil commitment without probable cause. The Fourteenth Amendment independently protects the rights not to be deprived of liberty without due process of law and not to be subjected to invasions of bodily integrity, including the forcible administration of antipsychotic drugs, absent constitutionally adequate justification and procedure.

114. In seizing, holding, examining, forcibly medicating, and seeking the continued commitment of Mary Doe, Defendants acted under color of State law. Brynn Marr held Mary Doe pursuant to custody and commitment orders issued under Chapter 122C of the North Carolina General Statutes; it did so as a 24-hour facility designated by the State for the custody and treatment of patients involuntarily committed to an inpatient psychiatric facility under State law; it assumed, by written certificate of need conditions and by memoranda of agreement signed with the Secretary of DHHS, the obligation to accept the State's involuntarily committed patients into beds transferred from a State psychiatric hospital; it receives direct State funding; and its examinations, hearing requests, and courtroom presentations in the Onslow County Case were integral parts of the State's commitment process with respect to Mary Doe.

115. The custody of persons seized under court order is a power traditionally and exclusively reserved to the State, and Brynn Marr exercised that power jointly with, and by delegation from, the State. Brynn Marr relied upon the power and authority of the State to refuse to discharge Mary Doe, isolate her from John Doe and her personal physicians, forcibly medicate her, and bill her and her insurer for "services" she could not refuse and to which she did not consent.

116. Defendant Taylor, Defendant Owens, Defendant Mitchell, Defendant Carcerano, Defendant Oladipo, Access TeleCare, UHS, and UHS of Delaware were willful participants in that joint activity under color of State law described in paragraphs 114 and 115 above, and their participation in this joint activity and operation proximately caused the injuries Mary Doe has suffered.

117. Defendants, acting in concert, deprived Mary Doe of her Fourth and Fourteenth Amendment rights by causing her continued seizure and confinement without probable cause, through examinations and presentations that were fabricated, deliberately false, or at the very least made with reckless disregard for the truth. Defendant Taylor's July 18, 2025 presentation to the court in the Onslow County Case, on which the court's dispositive finding rested, asserted as fact false accusations against John Doe she knew she had not investigated and could not support. Defendant Owens's examination certificates in the Onslow County Case recited boilerplate, omitted the required telehealth certification, and offered a one-word impression in place of the individualized examination that both North Carolina law and the Constitution require.

118. Defendants, acting in concert, further deprived Mary Doe of liberty without due process of law by presenting fabricated and reckless statements to the court in the Onslow County Case, the tribunal charged with reviewing her confinement, thereby corrupting the only process available to her.

119. Defendants, acting in concert, violated Mary Doe's Fourteenth Amendment right to bodily integrity from July 10, 2025 through August 29, 2025 by forcibly administering antipsychotic and psychotropic drugs to her under a purely internal two-physician protocol,

without judicial authorization, without the consent of her health care agent, in the face of documented contraindications, and in a manner that substantially departed from accepted professional judgment, practice, and standards.

120. The individual Defendants each acted intentionally, maliciously, and with reckless disregard of Mary Doe's clearly established rights as described herein above.

121. Defendants' violations of Mary Doe's rights, as described herein above, were caused by the official policies, customs, and deliberate indifference of Brynn Marr, UHS, UHS of Delaware, and Access TeleCare, including, but not limited to:

a. A policy of staffing the psychiatric care of involuntarily committed patients exclusively with remote contract practitioners who never examine patients in person;

b. A policy or custom of maximizing censuses and lengths of stay for insured patients, of which the 2020 federal False Claims Act resolution and the certificate of need conditions placed the entities on notice;

c. The failure to train and supervise practitioners regarding commitment examinations, courtroom presentations, and the constitutional limits on forced medication; and

d. Ratification of the conduct described above by managerial employees.

122. As a direct and proximate result of the Defendants' violations of her rights under color of State law as described herein, Mary Doe suffered the injuries described in paragraphs 105 through 110 above, including fifty-six days of lost liberty, forced medication, physical injury, and severe emotional distress.

123. Mary Doe is entitled to compensatory damages, punitive damages against the individual Defendants and, as permitted by law, the entity Defendants, and her reasonable attorneys' fees and costs under 42 U.S.C. § 1988.

**SECOND CAUSE OF ACTION**
**(Malicious Prosecution—Mary Doe Against Defendants Taylor, Owens, Brynn Marr, UHS, UHS of Delaware, and Access TeleCare)**

124. The allegations of all preceding paragraphs are realleged and incorporated by reference as if fully set forth herein.

125. Defendant Taylor, Defendant Owens, Brynn Marr, UHS, UHS of Delaware, and Access TeleCare instituted, procured, and maintained the continuation of the involuntary commitment proceeding against Mary Doe in the Onslow County Case from July 11, 2025 through August 29, 2025, by way of the examinations, certificates, hearing requests, presentations, and testimony described above.

126. Defendants acted with malice, including ill will, financial motive, and reckless disregard for Mary Doe's rights described above, and for the ulterior purposes of preserving a commercially insured admission, overriding John Doe as her health care agent, deliberately ignoring the well-documented medical history [redacted] and [redacted] attempted to provide to inform Mary Doe's treatment, and shielding themselves from scrutiny.

127. Defendants, in concert, acted without probable cause. Mary Doe did not meet the statutory criteria for continued inpatient involuntary commitment, as Dr. Tinney reported on August 28, 2025 and as the court ultimately held when Brynn Marr, without any competent medical evidence, attempted to involuntarily hold Mary Doe for an additional ninety days at the hearing on August 29, 2025 in the Onslow County Case. Any interim findings to the

contrary in the Onslow County Case were procured by Defendant Taylor's misrepresentations and Defendant Owens's defective examination certificates, which are insufficient to establish probable cause.

128. The involuntary commitment proceeding in the Onslow County Case terminated in Mary Doe's favor on August 29, 2025, when the court found the burden for involuntary commitment had not been met and ordered Brynn Marr to discharge Mary Doe.

129. The involuntary commitment proceeding in the Onslow County Case caused Mary Doe special injury beyond that incident to ordinary litigation, including, but not limited to:

a. The seizure of her person;

b. Fifty-six days of confinement and lost liberty;

c. Forced medication resulting in tardive dyskinesia; and

d. Other injuries described above.

130. As a direct and proximate result of Defendants' malicious prosecution in the Onslow County Case, Mary Doe suffered damages in an amount to be determined at trial, and the malicious, willful, and wanton character of Defendants' conduct entitles her to punitive damages under N.C. Gen. Stat. § 1D-15.

## <u>THIRD CAUSE OF ACTION</u>
**(Abuse of Process—Mary Doe Against Defendants Taylor, Brynn Marr, UHS, and UHS of Delaware)**

131. The allegations of all preceding paragraphs are realleged and incorporated by reference as if fully set forth herein.

132. In continuing and deploying the commitment process in the Onslow County Case, Defendants Taylor, Brynn Marr, UHS, and UHS of Delaware acted with ulterior purposes

collateral to the process's lawful objects of treatment and protection of Mary Doe as an involuntarily committed psychiatric patient, including, but not limited to, the following:

a. Generating per-diem revenue from an insured patient;

b. Overriding, neutralizing, and isolating John Doe as Mary Doe's health care agent;

c. Blocking a voluntary conversion or transfer that would have ended the admission and stream of revenue derived from Mary Doe's involuntary commitment to Brynn Marr;

d. Retaliating against John Doe for his attempts to assert his authority as Mary Doe's health care agent;

e. Retaliating against [redacted] for opposing Defendant Taylor's dangerous treatment plan for Mary Doe; and

f. Deflecting responsibility onto John Doe through the APS reporting and investigative machinery.

133. After the process issued, Defendants, acting in concert, committed willful acts not proper in its regular prosecution, including:

a. Pressing unsworn and false accusations in the Onslow County Case to unnecessarily extend Mary Doe's involuntary confinement, to the point of asking whether the Hospital was "allowed to ask for more than" the statutory maximum;

b. Refusing to convert Mary Doe to voluntary status precisely because voluntary status would permit her discharge or transfer and end the stream of revenue Brynn Marr received from Mary Doe's involuntary commitment;

c. Invoking the involuntary commitment to justify continued forced medication of Mary Doe without judicial oversight;

d. Procuring the annotation of the August 1, 2025 order in the Onslow County Case so that an abuse investigation would be initiated upon Mary Doe's discharge from Brynn Marr; and

e. Seeking a ninety-day extension of Mary Doe's involuntary commitment without any medical justification at the hearing in the Onslow County Case on August 29, 2025.

134. As a direct and proximate result, Mary Doe suffered damages in an amount to be determined at trial, and the malicious, willful, and wanton character of Defendants' conduct entitles her to punitive damages under N.C. Gen. Stat. § 1D-15.

## FOURTH CAUSE OF ACTION

**(False Imprisonment, Pleaded in the Alternative—Mary Doe Against Defendants Taylor, Owens, Brynn Marr, UHS, UHS of Delaware, and Access TeleCare)**

135. The allegations of all preceding paragraphs are realleged and incorporated by reference as if fully set forth herein.

136. Pleading in the alternative, to the extent any interval of Mary Doe's involuntary confinement at Brynn Marr, or any restraint imposed upon her by Defendants from July 10, 2025 through August 29, 2025, was not authorized by a valid order or by examinations conforming to Chapter 122C of the North Carolina General Statutes, Defendant Taylor,

Defendant Owens, Brynn Marr, UHS, UHS of Delaware, and Access TeleCare intentionally and unlawfully restrained Mary Doe against her will. The defects in Mary Doe's involuntary confinement at Brynn Marr include examinations conducted by telehealth without the certification required by North Carolina law, boilerplate findings that reflect no individualized examination by Defendant Owens or any other physician licensed to practice medicine in North Carolina, and detention procured and extended by knowingly false presentations by Defendant Taylor and Brynn Marr in the Onslow County Case.

137. Mary Doe did not consent to the restraint described in paragraph 136 above, was conscious of and harmed by it, and suffered damages in an amount to be determined at trial. The willful and wanton character of Defendants' conduct entitles Mary Doe to recover punitive damages under N.C. Gen. Stat. § 1D-15.

## FIFTH CAUSE OF ACTION

**(Battery—Mary Doe Against Defendants Taylor, Owens, Mitchell, Brynn Marr, UHS, UHS of Delaware, and Access TeleCare)**

138. The allegations of all preceding paragraphs are realleged and incorporated by reference as if fully set forth herein.

139. Defendant Taylor, Defendant Owens, and Defendant Mitchell ordered, and Brynn Marr's nurses carried out, intentional, harmful, and offensive physical contacts with Mary Doe from July 15, 2025 through August 29, 2025, including forcible intramuscular injections of chlorpromazine, haloperidol, lorazepam, and diphenhydramine and unlawfully physically restrained Mary Doe in connection with the forcible administration of these medications.

140. The contacts described in paragraph 139 above occurred in the total absence of lawful consent. Mary Doe lacked capacity to consent from the time of her admission on July 10,

2025, and the July 10, 2025 consent forms purportedly signed by Mary Doe were void. Mary Doe's lawful health care agent, John Doe, expressly refused consent, and no valid court order authorized forcible medication of Mary Doe.

141. The Hospital's internal two-physician protocol conferred no lawful authority to forcibly medicate Mary Doe. The protocol, and the choices made under it to forcibly medicate Mary Doe on multiple occasions from July 15, 2025 through August 29, 2025, substantially departed from accepted professional judgment and standard of care of psychiatric physicians practicing in Onslow County, North Carolina as follows:

a. Administering benzodiazepine against a written contraindication and the advice of Mary Doe's longtime personal physician, [redacted]

b. Injecting a first-generation antipsychotic into Mary Doe when Brynn Marr's notes reflect that she was [redacted]

c. Escalation to maximum-dose polypharmacy for Mary Doe; and

d. No laboratory monitoring of the effects of administering these medications to Mary Doe from July 10, 2025 through August 29, 2025.

142. As a direct and proximate result of the unlawful conduct described in paragraphs 139 through 141 above, Mary Doe suffered physical injury, including a medication-induced movement disorder, along with pain, indignity, and severe emotional distress. Mary Doe is entitled to recover compensatory damages from Defendants and, given the willful, wanton, and malicious character of the conduct, punitive damages under N.C. Gen. Stat. § 1D-15. The entity Defendants are vicariously liable for these batteries.

## <u>SIXTH CAUSE OF ACTION</u>

**(Defamation Per Se—John Doe Against Defendants Taylor, Access TeleCare, Brynn Marr, UHS, and UHS of Delaware)**

143. The allegations of all preceding paragraphs are realleged and incorporated by reference as if fully set forth herein.

144. Beginning on or about July 16, 2025 and continuing through August 29, 2025, Defendant Taylor made and published false statements of fact of and concerning John Doe, including, but not limited to, the following:

a. That John Doe had fabricated or induced Mary Doe's illness, memorialized as the diagnosis "factitious disorder imposed on another" and coded F68.A;

b. That John Doe had [redacted];

c. That John Doe had [redacted];

d. That John Doe was medically neglecting Mary Doe; and

e. That John Doe was [redacted].

145. Defendant Taylor published the false statements described in paragraph 144 above to third persons outside any judicial proceeding, including:

a. In Mary Doe's medical chart, which published them to Brynn Marr staff, to the practitioners of Access TeleCare, and to every subsequent reader of Mary Doe's medical records;

b. In reports and repeated telephone communications to APS agencies in Onslow County, Mecklenburg County, and [redacted] County, [redacted] and to other agencies; and

c. Upon information and belief, in clinical information transmitted to CareFirst in support of authorization for Mary Doe's admission and treatment at Brynn Marr.

146. Defendant Mitchell, Defendant Carcerano, and Defendant Oladipo republished the F68.A false accusation described in paragraph 144 above in their own signed notes from July 15, 2025 through August 29, 2025, and the Hospital republished these false statements in assessments, billing records, and communications built from Mary Doe's chart.

147. The statements described in paragraph 144 above were false. No agency substantiated them, there was no factual or medical basis for them at the time they were made by Defendants.

148. The false statements described in paragraph 144 above are actionable per se against Defendants. They accuse John Doe of crimes involving moral turpitude, including the abuse, neglect, and [redacted] of Mary Doe as a disabled adult, and by unmistakable insinuation the [redacted] of Mary Doe, and they subjected him to ridicule, contempt, and disgrace.

149. Defendant Taylor acted with actual malice and in bad faith in publishing the false statements about John Doe described in paragraph 144 above. Defendant Taylor recorded the false accusations before ever speaking with John Doe; she coded as a diagnosis factitious disorder imposed by another without any valid clinical basis or meeting the diagnostic criteria; she shopped the false report of John Doe's purported abuse and neglect of Mary Doe from agency to agency when the first agencies did not act; and she deployed the false accusations against John Doe to gain leverage over him as a health care agent who stood in the way of the

Hospital's financial interest in assuring that Mary Doe would remain involuntarily committed and serve as a source of revenue for Brynn Marr, UHS, and UHS of Delaware. Defendant Taylor's bad faith and malicious purpose described above defeats any qualified privilege and any statutory good-faith immunity, including under N.C. Gen. Stat. § 108A-102(c).

150. As a direct and proximate result of Defendant Taylor's defamation, John Doe suffered presumed and actual damages, including injury to his reputation, exposure to investigation by multiple APS agencies, severe emotional distress, humiliation, and expense.

151. Access TeleCare, Brynn Marr, UHS, and UHS of Delaware are liable for the publications of their agents, including Defendant Taylor, who were acting within the scope of their agency when they defamed John Doe as described herein above. The malicious and willful character of the conduct of Defendants entitles John Doe to punitive damages under N.C. Gen. Stat. § 1D-15.

**<u>SEVENTH CAUSE OF ACTION</u>**
**(Intentional Infliction of Emotional Distress—Both Plaintiffs Against Defendants Taylor, Owens, Brynn Marr, UHS, UHS of Delaware, and Access TeleCare)**

152. The allegations of all preceding paragraphs are realleged and incorporated by reference as if fully set forth herein.

153. From July 10, 2025 through August 29, 2025, Defendants engaged in extreme and outrageous conduct exceeding all bounds tolerated by decent society against Mary Doe and John Doe, including:

a. Fabricating and broadcasting, in Mary Doe's chart at Brynn Marr and to APS services agencies across at least three counties and two states, an accusation that

John Doe was abusing, [redacted], and possibly [redacted] his disabled daughter, Mary Doe;

b. Shopping the false accusation described in subparagraph (a) above from agency to agency;

c. Stripping Mary Doe, who Brynn Marr described as [redacted] upon admission, of the support and input of John Doe as her designated health care agent and turning him away when he came to visit her while she was involuntarily confined to the Hospital;

d. Forcibly injecting Mary Doe with drugs her personal physician had expressly warned against in writing;

e. Deliberately feeding Mary Doe the foods documented to trigger [redacted] response that caused her psychosis; and

f. Arranging for an APS abuse and neglect investigation to initiate against John Doe upon Mary Doe's discharge from Brynn Marr.

154. Defendants intended to cause severe emotional distress to Mary Doe and John Doe, or at the very least acted with reckless indifference to the likelihood of causing it, in committing the outrageous conduct against Plaintiffs described in paragraph 153 above.

155. As a direct and proximate result of the extreme and outrageous conduct committed by Defendants described herein above, Mary Doe and John Doe each suffered severe and disabling emotional distress, with physical manifestations including sleeplessness and anxiety, of a kind no reasonable person could be expected to endure, and each is entitled to compensatory and, under N.C. Gen. Stat. § 1D-15, punitive damages.

## EIGHTH CAUSE OF ACTION
**(Negligent Infliction of Emotional Distress, Pleaded in the Alternative—Both Plaintiffs Against All Defendants)**

156. The allegations of all preceding paragraphs are realleged and incorporated by reference as if fully set forth herein.

157. Pleading in the alternative, Defendants owed Plaintiffs a duty of reasonable care in the diagnosis, reporting, treatment, and custodial decisions described above and breached that duty through the negligent conduct alleged in this Complaint, including the conduct alleged in the Ninth and Tenth Causes of Action.

158. It was reasonably foreseeable that this conduct would cause severe emotional distress to Mary Doe, the patient, and to John Doe, her father and health care agent, who received the Hospital's reports, watched his daughter's deterioration, and was the subject of false and malicious accusations that he had abused and neglected Mary Doe as described above.

159. As a direct and proximate result, each Plaintiff suffered severe emotional distress and is entitled to recover damages from Defendants in an amount to be determined at trial.

## NINTH CAUSE OF ACTION
**(Medical Malpractice—Mary Doe Against Defendants Taylor, Owens, Mitchell, Carcerano, Oladipo, Brynn Marr, UHS, UHS of Delaware, and Access TeleCare)**

160. The allegations of all preceding paragraphs are realleged and incorporated by reference as if fully set forth herein.

161. Defendant Taylor, Defendant Owens, Defendant Mitchell, Defendant Carcerano, and Defendant Oladipo, and Brynn Marr through its nursing and clinical staff, are health care providers who undertook Mary Doe's care and owed her the duty to comply with the standards of practice among members of the same health care profession with similar training and

experience situated in the same or similar communities at the time of the care. *See* N.C. Gen. Stat. § 90-21.12.

162. Defendants breached those standards in ways that include, but are not limited to, the following:

a. Misdiagnosing [redacted] and [redacted] and rejecting a decade of Mary Doe's documented medical diagnoses, on the basis of brief video encounters, without an in-person psychiatric examination of Mary Doe, obtaining or reviewing the treating physicians' records, or any medical workup for known [redacted] contributors;

b. Entering, coding, and perpetuating a false diagnosis for Mary Doe of factitious disorder imposed by another without evaluating John Doe, the person to whom such a diagnosis applies;

c. Removing medically ordered [redacted] and deliberately exposing Mary Doe to [redacted] despite a documented pattern linking [redacted] to [redacted] and psychosis;

d. Administering a benzodiazepine to Mary Doe despite receiving a written contraindication from Mary Doe's treating psychiatrist;

e. Selecting and forcibly injecting chlorpromazine, and administering haloperidol, to Mary Doe, who Brynn Marr's notes described as "[redacted] and who has a documented history of extrapyramidal reactions;

f. Escalating quetiapine for Mary Doe to the maximum labeled dose and layering additional psychotropic medications for Mary Doe without clinical justification and despite Mary Doe's adverse reaction to these medications;

g. Administering maximum-dose antipsychotic polypharmacy to Mary Doe for eight weeks without laboratory monitoring;

h. Failing to recognize, monitor for, and respond to emerging involuntary movements in Mary Doe, which were side effects of the medication prescribed and administered to Mary Doe by Brynn Marr;

i. Performing and certifying commitment examinations of Mary Doe by telehealth without the required certification and without individualized findings;

j. Failing to honor the decisions of Mary Doe's health care agent, John Doe, and to obtain lawful consent or judicial authorization before forcibly administering medication to Mary Doe; and

k. Failing to formulate any discharge plan for Mary Doe responsive to her actual medical conditions.

163. Each breach described above was a proximate cause of injury to Mary Doe, including a medication-induced movement disorder that is potentially permanent, physical pain, prolonged confinement, exacerbated symptoms, and severe emotional distress.

164. Because Mary Doe suffered permanent injury and because Defendants acted in reckless disregard of her rights, grossly negligently, fraudulently, intentionally, and with malice, the limitation of N.C. Gen. Stat. § 90-21.19(a) does not apply. N.C. Gen. Stat. § 90-21.19(b).

165. No certification under Rule 9(j) of the North Carolina Rules of Civil Procedure is required for a medical malpractice claim filed in federal court. *Berk v. Choy*, 607 U.S. ___ (2026). The allegations of this Count rest in any event on the documented findings and opinions of qualified physicians, including [redacted] Dr. Tinney, [redacted] and [redacted]

166. The entity Defendants are vicariously liable for these breaches under respondeat superior and principles of actual and apparent agency, and Mary Doe is entitled to recover compensatory and, under N.C. Gen. Stat. § 1D-15, punitive damages in an amount to be determined at trial.

## TENTH CAUSE OF ACTION

**(Corporate Negligence: Negligent Credentialing, Supervision, and Retention—Mary Doe Against Defendants Brynn Marr, UHS, UHS of Delaware, and Access TeleCare)**

167. The allegations of all preceding paragraphs are realleged and incorporated by reference as if fully set forth herein.

168. Brynn Marr, and through their control of it UHS and UHS of Delaware, owed Mary Doe direct, nondelegable duties as a hospital, including, but not limited to, the following:

a. To select and credential competent practitioners;

b. To supervise the care delivered within its facility;

c. To adopt and enforce policies protecting patients such as Mary Doe, including policies governing consent, health care agents, forced medication, and abuse reporting; and

d. To know and follow the law governing the involuntarily committed psychiatric patients it confines and for which it receives State funds.

169. Access TeleCare owed corresponding duties to those described in paragraph 168 above to supervise the practitioners it supplied to Brynn Marr, UHS, and UHS of Delaware.

170. Defendants breached their duties to Mary Doe in ways that include the following:

a. Credentialing and retaining, as the practitioner principally responsible for involuntarily committed patients, Defendant Taylor, a newly licensed out-of-state contract nurse practitioner who would never set foot in the Hospital;

b. Adopting a telepsychiatry staffing model with no in-person psychiatric evaluation and no meaningful physician oversight;

c. Permitting unsworn clinical misrepresentations to the court in the Onslow County Case without supervision, review, or accountability;

d. Operating a forced medication protocol without judicial authorization, health care agent involvement, or other safeguards;

e. Failing to act on the 2022 and 2023 statements of deficiencies, including deficiencies in the investigation of abuse allegations;

f. Maintaining census-driven and revenue-driven utilization practices of the kind addressed in the 2020 federal resolution; and

g. Failing to enforce policies honoring health care powers of attorney and the rights of patients under Chapter 122C of the North Carolina General Statutes.

171. Each Defendant had actual or constructive notice of these deficiencies from, among other sources, the 2020 federal False Claims Act resolution, the 2022 and 2023 survey findings, and the events of Mary Doe's own admission.

172. The breaches described herein proximately caused the injuries to Mary Doe described above. To the extent this claim sounds in medical malpractice under State law, no Rule 9(j) certification is required pursuant to *Berk v. Choy*, 607 U.S. ___ (2026), and the allegations of N.C. Gen. Stat. § 90-21.19(b) are realleged and incorporated by reference herein. Mary Doe is entitled to compensatory and, under N.C. Gen. Stat. § 1D-15, punitive damages against Defendants in an amount to be determined at trial.

WHEREFORE, Plaintiffs respectfully request that this Court:

1. Enter judgment in favor of Plaintiff Mary Doe and against the Defendants named therein, jointly and severally, on the First through Fifth and Seventh through Tenth Causes of Action;

2. Enter judgment in favor of Plaintiff John Doe and against the Defendants named therein, jointly and severally, on the Sixth, Seventh, and Eighth Causes of Action;

3. Award Plaintiffs compensatory damages against Defendants, jointly and severally, in an amount to be determined at trial;

4. Award Plaintiffs punitive damages pursuant to N.C. Gen. Stat. § 1D-15 and federal law in an amount to be determined at trial;

5. Award Plaintiff Mary Doe her reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

6. Award Plaintiffs their costs;

7. Award Plaintiffs pre-judgment and post-judgment interest at the maximum lawful rate;

8. Allow a trial by jury on all issues so triable; and

9. Grant Plaintiffs such other and further relief as the Court deems just and proper.

Respectfully submitted, this the 16th day of July, 2026.

**PARKER BRYAN BRITT TANNER & JENKINS, P.L.L.C.**

ATTORNEYS FOR PLAINTIFFS

Alicia Jurney
N.C. State Bar #37133
P.O. Box 1069
Raleigh, NC 27602
Telephone: (919) 833-3115
Facsimile: (919) 833-3116
Email: alicia@parkerbryanlaw.com

**SMITH DEBNAM NARRON DRAKE SAINTSING & MYERS, L.L.P.**

ATTORNEYS FOR PLAINTIFFS

Michael J. Denning
N.C. State Bar #36715
P.O. Box 176010
Raleigh, NC 27619
Telephone: (919) 250-2000
Facsimile: (919) 250-2100
Email: mdenning@smithdebnamlaw.com